IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TEAMSTERS LOCAL UNION NO. 705, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 19-cv-07176 ) ) Judge Andrea R. Wood |
| L. NEILL CARTAGE CO., INC., et al., | ) ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Teamsters Local Union No. 705 ("Union") has brought the present action to enforce labor arbitration awards issued by a grievance panel against Defendants L. Neill Cartage Co., Inc. ("Neill Cartage") and T.R.N. Transportation, Inc. ("T.R.N."). (Dkt. No. 25.) In response, Defendants have moved to vacate or modify the arbitration awards and for summary judgment. (Dkt. No. 26.) For the reasons that follow, the Court grants in part and denies in part the Union's motion to enforce and denies Defendants' motion to vacate.

**BACKGROUND**

**I.  Federal Rule of Civil Procedure 56 and Local Rule 56.1**

The Court begins by clarifying the procedural posture of this case. Most often, an action to confirm or vacate an arbitration award is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq. See Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 578 (2008). The FAA "removes actions to confirm or vacate arbitration awards from the realm of civil cases governed by the Federal Rules of Civil Procedure." *Webster v. A.T. Kearney, Inc.*, 507 F.3d 568, 570 (7th Cir. 2007) (citing 9 U.S.C. § 6). Therefore, no "filing conceived by the Federal Rules of Civil Procedure," such as a motion for summary judgment, need be filed. *Id.* at 571. Presumably, that is

why the Union styled its amended complaint as a motion to enforce and did not adhere to the requirements of either Federal Rule of Civil Procedure 56 or Northern District of Illinois Local Rule 56.1. By contrast, Defendants' motion to vacate is styled as a Rule 56 motion for summary judgment.

Unlike a traditional arbitration award, a federal court's "jurisdiction to enforce 'final and binding' arbitration awards issued pursuant to a [collective bargaining agreement]" is provided by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). *Lippert Tile Co. v. Bricklayers Loc. 5*, 724 F.3d 939, 944 (7th Cir. 2013) (quoting *Gen. Drivers, Loc. Union No. 89 v. Riss & Co., Inc.*, 372 U.S. 517 (1963)). Consequently, a decision from a panel established by a collective bargaining agreement "is not a genuine arbitration subject to the [FAA]." *Merryman Excavation, Inc. v. Int'l Union of Operating Eng'rs, Loc. 150*, 639 F.3d 286, 290 (7th Cir. 2011). Rather, "an action to enforce [a labor arbitration award] is a 'breach of a federal labor contract subject to section 301 jurisdiction—not an FAA action.'" *Painters' Dist. Council No. 30 v. Rock-It Interiors, Inc.*, 190 F. Supp. 3d 803, 808 (N.D. Ill. 2016) (quoting *Merryman*, 639 F.3d at 290). Accordingly, the Federal Rules of Civil Procedure are not displaced and courts routinely resolve motions to enforce or vacate labor arbitration awards by way of motions for summary judgment. *See, e.g.*, *Arch of Ill. v. Dist. 12, United Mine Workers of Am.*, 85 F.3d 1289, 1291–92 (7th Cir. 1996). Defendants' motion to vacate is therefore properly brought as a motion for summary judgment pursuant to Rule 56.

As required in this District when moving for summary judgment, Defendants submitted a statement of material facts in support of their motion to vacate. (*See* Defs.' Statement of Material Facts ("DSMF"), Dkt. No. 28); L.R. 56.1(a). Then, under Local Rule 56.1(b), the Union was required to submit a response to Defendants' statement of material facts that admitted, disputed,

or admitted in part and disputed in part each of Defendants' factual assertions. Yet the Union failed to include such a submission with its response in opposition to Defendants' motion to vacate. As a result, under Local Rule 56.1(e)(3), the Court could treat Defendants' facts as undisputed due to the Union's failure to properly controvert any of them. That said, based on its response brief, the Court does not believe that the Union has any significant disputes as to the facts set forth in Defendants' statement of material facts.

Local Rule 56.1(b) also required the Union to submit a separate statement of additional facts to introduce any new facts not set forth in Defendants' statement of material facts, but the Union failed to comply with this requirement as well. *Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809 (7th Cir. 2005) ("Local Rule 56.1 *requires specifically* that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate statement of any additional facts that require the denial of summary judgment." (internal quotation marks and alteration omitted)); *Mervyn v. Nelson Westerberg, Inc.*, 142 F. Supp. 3d 663, 664 (N.D. Ill. 2015) (collecting cases). Instead, the Union sets forth new facts by citing directly to the record in its brief in response to Defendants' motion to vacate. The Court, in its discretion, could disregard the Union's new facts. *Cichon*, 401 F.3d at 809–810 ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed."). But again, because the Court cannot discern any material disputes regarding the Union's new facts (and there does not appear to have been an intentional failure to comply with the rules), the Court will exercise its discretion to consider them.

## II. Factual Background

Consistent with the discussion above, the following facts are undisputed. Neill Cartage is a trucking company that was founded in 1946, at a time when the trucking industry was heavily regulated. (DSMF ¶ 1, Dkt. No. 28.) Throughout its existence, Neill Cartage has been wholly owned and operated by members of the Neill family. (DSMF ¶ 1; Pl.'s Opp'n to Defs.' Mot to Vacate and for Summ. J. at 3, 7, Dkt. No. 34.) As a result of the regulations in place at the time of its founding, Neill Cartage was only authorized to provide delivery services in and out of the "Chicago Commercial Zone," as defined by 49 C.F.R. § 372.233. (DSMF ¶ 2.) In 1966, Neill Cartage entered the warehousing business, which came to form the core of its business operations. (*Id.* ¶ 3.) Even after the trucking industry was deregulated in 1980, Neill Cartage continued to limit substantially its trucking operations to the Chicago Commercial Zone. (*Id.* ¶ 4.) At the same time, deregulation gave the Neill family the opportunity to serve the needs of Neill Cartage's warehousing clients by providing delivery services outside of the Chicago Commercial Zone. (*Id.* ¶ 5.) Thus, the Neill family formed T.R.N. as a separate company, which allowed them to protect Neill Cartage's warehousing assets from the majority of the risk of liability from the Neill family's trucking business. (*Id.* ¶¶ 5–7.) Neill Cartage has never held any ownership interest in T.R.N. (*Id.* ¶ 6.)

Over the years, Neill Cartage's trucking operations have been governed by a series of collective bargaining agreements between the company and the Union. (*Id.* ¶ 8.) Relevant here is the Addendum to the 2013–2015 Joint Area Cartage Agreement Covering Local Cartage Employees of Road Carriers ("CBA"), which incorporates by reference the 2013–2015 Joint Area Cartage Agreement Covering Local Cartage Employees of Road Carriers ("MCLAC"). (*Id.* ¶¶ 9–11.) T.R.N. has never been a party to any collective bargaining agreement between Neill Cartage

4

and the Union, and the Union was well aware of T.R.N.'s trucking business throughout the negotiations of the CBA and the MCLAC. (*Id.* ¶¶ 12–14.) Prior to the dispute giving rise to this action, the Union never argued that T.R.N. should assume the obligations imposed by the CBA or any predecessor agreement and never sought to organize T.R.N.'s drivers. (*Id.* ¶ 17.)

In Spring 2019, Neill Cartage advised the Union that it intended to cease its trucking operations. (*Id.* ¶ 22.) Shortly thereafter, the Union filed Grievance Number 307974, claiming that Neill Cartage improperly subcontracted work to T.R.N. and other similar vendors. (*Id.* ¶ 23.) Under Section 13.2(a) of the MCLAC, Neill Cartage was prohibited from subcontracting covered work to non-unit employees or to other business entities unless otherwise permitted by the CBA. (Am. Compl., Ex. B, MCLAC § 13.2(a), Dkt. No. 25-2; Am. Compl., Ex. C, Dkt. No. 25-3.) About a month later, the Union filed Grievance Number 261568, which asserted that Neill Cartage violated the MCLAC by failing to have T.R.N. assume Neill Cartage's obligations under the CBA. (DSMF ¶ 24.) In particular, the grievance cited Section 1.3 of the MCLAC, which provided:

> The Employer's obligations under this Agreement shall be binding upon its successors, administrators, executors and assigns. The Employer agrees that the obligations of this Agreement shall be included in the agreement of sale, transfer or assignment of the business. In the event an entire active or inactive operation, or a portion thereof, or rights only, are sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership, or bankruptcy proceedings, such operation or use of such rights shall continue to be subject to the terms and conditions of this Agreement for the life thereof. Transactions covered by this provision include stock sales or exchanges, mergers, consolidations, spin-offs or any other method by which a business is transferred. It is understood by this Section that the signator Employer shall not sell, lease or transfer such run or runs or rights to a third party to evade this Agreement. In the event the Employer fails to require the purchaser, transferee, or lessee to assume the obligations of this Agreement, the Employer (including partners thereof) shall be liable to the Local Union and to the Employees covered for all damages sustained as a result of such failure to require the assumption of the terms of this Agreement until its expiration date, but shall not be liable after the purchaser, the transferee or lessee has agreed to assume the obligations of this Agreement. The obligations set forth above shall

> not apply in the event of the sale, lease or transfer of a portion of the rights comprising less than all of the signator Employer's rights to a non-signator company unless the purpose is to evade this Agreement.

(MCLAC § 1.3; Am. Compl., Ex. D, at Dkt. No. 25-4.) Both grievances named only Neill Cartage as the employer and were served only on that company. (DSMF ¶ 25.)

Before a hearing could be held on the grievances, Neill Cartage ceased its trucking operations and terminated its two drivers who were the sole remaining members of its bargaining unit. (*Id.* ¶¶ 20, 26.) On September 11, 2019, a Grievance Panel held a hearing on Grievance Numbers 307974 and 261568. At the close of the hearing, the Grievance Panel found in favor of the Union on both grievances and required Neill Cartage to cease and desist subcontracting and further required it to have T.R.N. assume Neill Cartage's CBA with the Union ("September 2019 Grievance Award"). (*Id.* ¶¶ 37–38.)

On September 20, 2019, the Union filed two additional grievances, Grievance Numbers 312047 and 312048, on behalf of the two recently terminated Neill Cartage drivers. (*Id.* ¶ 39.) Both grievances asserted that Neill Cartage "unlawfully laid off/terminated" the drivers in order to "get rid of the Union." (*Id.*) Following a hearing held on January 15, 2020, the Grievance Panel reiterated its findings from the September 2019 Grievance Award, ordered Neill Cartage to make the terminated drivers whole, and ordered Neill Cartage offer them work at T.R.N. ("January 2020 Grievance Award"). (*Id.*)

The Union filed the present action against both Neill Cartage and T.R.N. on October 31, 2019, seeking to enforce the September 2019 Grievance Award after Defendants refused to comply with it. It amended its complaint on February 20, 2020, to seek enforcement of the January 2020 Grievance Award as well. Among other things, the Union's amended complaint requests that the Court order Defendants to pay damages stemming from T.R.N.'s refusal to

6

assume Neill Cartage's CBA with the Union and order T.R.N. to assume the CBA and offer employment to the two terminated drivers. Subsequently, Defendants filed their present motion to vacate the Grievance Panel's awards and for summary judgment.

## DISCUSSION

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Here, Defendants' motion seeks to vacate the September 2019 Grievance Award insofar as it imposes any obligation on T.R.N.[1] because T.R.N. was not a party to the underlying grievances and was a nonsignatory to the CBA, thereby precluding the Grievance Panel from ordering it to do anything. In addition, Defendants seek to vacate the January 2020 Grievance Award in its entirety. Again, they argue that the Grievance Panel could not order T.R.N. to take action. Defendants further claim that the lawfulness of Neill Cartage's decision to terminate the two drivers is now res judicata and therefore the January 2020 Grievance Award cannot be enforced against either Neill Cartage or T.R.N.

"A court's role in reviewing a labor arbitration award is 'very limited.'" *Ameren Ill. Co. v. Int'l Bhd. of Elec. Workers, Loc. Union 51*, 906 F.3d 612, 616 (7th Cir. 2018) (quoting *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 567 (1960)). Thus, a court is "not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987). "As long as the arbitrator's award draws its essence from

---

[1] Defendants do not challenge the September 2019 Grievance Award's rulings concerning Neill Cartage's subcontracting practices (although they do not concede that those rulings were correct).

the collective bargaining agreement, and is not merely his own brand of industrial justice, the award is legitimate." *Id.* (internal quotation marks omitted). Put differently, "if an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed a serious error does not suffice to overturn his decision." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (internal quotation marks omitted).

> I. **Grievance Panel's Interpretation of the CBA**

"Judicial review of a labor arbitration award typically is confined to the narrow question of whether the arbitrator's reasoning draws its essence from the parties' agreement." *Unite Here Loc. 1 v. Hyatt Corp*, 862 F.3d 588, 600 (7th Cir. 2017). The question "is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract. If they did, their interpretation is conclusive." *Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1195 (7th Cir. 1987). By contrast, "when the arbitrator ***must*** have based his award on some body of thought, or feeling, or policy, or law that is outside the contract (and not incorporated in it by reference, either)" then the award cannot be said to have drawn its essence from the CBA. *Ethyl Corp. v. United Steelworkers of Am., AFL-CIO-CLC*, 768 F.2d 180, 184–85 (7th Cir. 1985) (citation omitted).

Here, there is little doubt that the Grievance Panel's awards as to Neill Cartage drew their essence from the CBA. In particular, Section 13.2(a) of the MCLAC permits Neill Cartage to subcontract in limited circumstances but forbids it from using subcontracting "as a subterfuge to violate this Agreement, or to avoid hiring additional Employees" and is made "applicable to the establishment or continuation by [Neill Cartage] of a transportation company or business which

engages in the same type of operation covered by this Agreement, which company or business is owned or controlled by [Neill Cartage]." (MCLAC § 13.2(a).) Further, the MCLAC allows employees who are laid off due to the cessation of operations within the scope of the agreement to be given the first opportunity for available regular employment at any other operation of the Employer within the area of the agreement. (*Id.* § 8.5(b).) Finally, Section 1.3 of the MCLAC makes Neill Cartage's "obligations under this Agreement . . . binding upon its successors, administrators, executors and assigns" and further imposes liability on Neill Cartage if it "fails to require the purchaser, transferee or lessee to assume the obligations" of the CBA. (*Id.* § 1.3.) Taken together, the Court concludes that the Grievance Panel's rulings, including the requirement that Neill Cartage have T.R.N. assume the CBA and offer employment to the terminated drivers, were based on the Grievance Panel's interpretation of the MCLAC.

## II. Enforceability of the Grievance Panel's Awards Against T.R.N.

Defendants do not contend that the Grievance Panel lacked the contractual authority to impose remedies directed at Neill Cartage. Indeed, as discussed above, those remedies are rooted in the plain language of the CBA. However, Defendants contend that the Grievance Panel exceeded the scope of its authority by also directing its awards at T.R.N., a nonsignatory to the CBA.

"[W]hen a party to the arbitration contends that the arbitrator acted beyond his designated authority, [a court's] task is limited to determining whether the arbitrator abided by the contractual limits placed on him to decide the dispute." *Am. Postal Workers Union, AFL-CIO v. Runyon*, 185 F.3d 832, 835 (7th Cir. 1999). An arbitrator's authority may be limited by either the contract or the issue submitted to the arbitrator. *Id.* Here, Sections 1.3, 8.5(b), and 13.2(a) of the MCLAC gave the Grievance Panel at least an arguable basis to consider Neill Cartage's

9

relationships with third parties such as T.R.N. In particular, Section 1.3 necessarily entails consideration of whether some separate entity might be deemed as Neill Cartage's successor, administrator, executor, or assign. And Grievance Number 261568 squarely presented the issue of whether Neill Cartage violated the CBA by failing to have T.R.N. assume Neill Cartage's contractual obligations. (Am. Compl., Ex. D.) The question is whether the Grievance Panel exceeded its authority by entering its awards directly against T.R.N.

As an initial matter, both the September 2019 and January 2020 Grievance Awards are unclear as to whether they affirmatively direct T.R.N. to assume the CBA and hire the terminated drivers or instead direct Neill Cartage to require T.R.N. to take those actions. The latter interpretation is more consistent with the language of the CBA, but there is language in the record that supports the former interpretation. For instance, when the Grievance Panel announced the September 2019 Grievance Award at the hearing, the panel stated that "the grievance will be applied to T.R.N." and its later confirmation of that ruling stated "T.R.N. assumes the CBA pursuant to panel ruling in grievance 307974." (Am. Compl., Ex. G., Dkt. No. 25-7; Pl.'s Opp'n to Defs.' Mot to Vacate and for Summ. J., Ex. C, Sept. 11, 2019 Grievance Hearing Tr. 62:7–8, Dkt. No. 34-3.)

Normally, a "district court should not interpret an ambiguous arbitration award." *Teamsters Loc. No. 579 v. B&M Transit, Inc.*, 882 F.2d 274, 278 (7th Cir. 1989). Rather, "[i]f an award is unclear, the court should send it back to the arbitrator for clarification." *Id.* But remand is disfavored given "the interest in prompt and final arbitration." *Id.* Here, remand is unnecessary because the September 2019 Grievance Award unambiguously held that T.R.N. was obligated to assume the CBA. Similarly, the January 2020 Grievance Award stated that the terminated drivers were entitled to an offer of employment at T.R.N. The only question is whether the Grievance

10

Panel directly imposed those obligations on T.R.N. or whether it did so indirectly by ordering Neill Cartage to require T.R.N. to take the required actions or risk monetary liability. For present purposes, that distinction is irrelevant because the Union now asks this Court to enforce the Grievance Panel's awards directly against T.R.N.

The Union contends that this Court can enforce the Grievance Panel's awards against T.R.N. because T.R.N. operated as a single employer or alter ego with Neill Cartage or was its successor. All three doctrines are means of binding nonsignatories to arbitration agreements. *See Lippert Tile Co.*, 724 F.3d at 946–47; *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687–88 (7th Cir. 2005); *Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312–13 (7th Cir. 1987); *see also Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) ("[A] nonsignatory party may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency." (internal quotation marks omitted)). "The single employer doctrine holds that when two entities are sufficiently integrated, they will be treated as a single entity for certain purposes." *Lippert Tile Co.*, 724 F.3d at 946. Relatedly, insofar as Neill Cartage has ceased its trucking operations, the Union argues that T.R.N. is its successor. "The successorship doctrine applies wherever there is a reorganization that results in a substantial continuation of the prior business by the successor and either obliterates the previous business or leaves it as an empty shell." *Dore & Assocs. Contracting, Inc. v. Int'l Union of Operating Eng'rs, Loc. Union No. 150*, No. 15 C 6221, 2017 WL 3581159, at *6 (N.D. Ill. Aug. 18, 2017) (internal quotation marks omitted). Finally, "the alter ego doctrine focuses on the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement." *Centor Contractors*, 831 F.2d at 1312 (internal quotation marks omitted). By invoking these doctrines, the Union

11

essentially argues that T.R.N. stands in Neill Cartage's shoes with respect to the Grievance Panel's awards, such that the Grievance Panel's commands to Neill Cartage must be treated as commands to T.R.N.

Importantly, the issue of whether the Grievance Panel's awards can be enforced against a nonsignatory like T.R.N. is a question of arbitrability. *See Lippert Tile Co.*, 724 F.3d at 944, 946. "Unless the parties clearly provide otherwise, the question of arbitrability is properly decided by a court, not the arbitrator." *Int'l Bhd. of Elec. Workers, Local 21 v. Ill. Bell Tel. Co.*, 491 F.3d 685, 687 (7th Cir. 2007). Neither the Union nor Defendants contend that the CBA delegated questions of arbitrability to the Grievance Panel. Thus, whether the Grievance Panel's awards can be enforced against T.R.N. is a question for this Court. Yet, neither party has introduced sufficient evidence for this Court to rule as a matter of law as to the applicability of the single-employer, successor, or alter-ego doctrines. Insofar as the Union's motion to enforce could be treated as a motion for summary judgment, the only record evidence bearing on the applicability of any of the three doctrines shows simply that Neill Cartage and T.R.N. have common ownership and common management. But the necessary inquiries weigh the totality of the circumstances and evidence of common ownership and management, without more, is not dispositive. *See, e.g.*, *Centor Contractors*, 831 F.2d at 1312–13; *Laborers' Pension Fund v. RAI Concrete, Inc.*, No. 1:17-CV-08748, 2021 WL 4146888, at *5 (N.D. Ill. Sept. 11, 2021); *Dore & Assocs.*, 2017 WL 3581159, at *10.

In short, the Court concludes that it cannot determine whether or not the September 2019 and January 2020 Grievance Awards are enforceable against T.R.N. based on the current record. Since its enforceability against T.R.N. was the only issue before this Court concerning the September 2019 Grievance Award, the Union's motion to enforce and Defendants' motion to

12

vacate that award are both denied without prejudice to renewal. The parties are granted leave to conduct appropriate discovery to properly present their arguments as to the enforceability of the Grievance Panel's awards against T.R.N. Then, the parties may file renewed motions for summary judgment.

### III.  Res Judicata

Next, Defendants argue that the January 2020 Grievance Award should be vacated because the National Labor Relations Board ("NLRB") has issued a final decision concluding that the two drivers who brought Grievance Numbers 312047 and 312048 were not wrongfully terminated. Specifically, following the Grievance Panel's rulings at issue here, the Union filed an unfair labor practice charge with the NLRB pursuant to § 8(a) of the National Labor Relations Act, 29 U.S.C. § 158(a), claiming that Neill Cartage improperly terminated its employees and transferred their work to T.R.N. (DSMF ¶¶ 42–43.) The NLRB dismissed that charge, finding that the Union's evidence failed to show that Neill Cartage "unlawfully transferred bargaining unit work when it closed Neill Cartage's trucking operations, or that [Neill Cartage] discharged unit employees for their protected concerted, or union activities, or for reasons other than those advanced by [Neill Cartage]." (*Id.* ¶ 44.) Thus, Defendants contend that the doctrine of res judicata precludes the Union from seeking enforcement of the January 2020 Grievance Award issued in connection with the drivers' claims that they were unlawfully terminated.

"Res judicata bars not only those issues which were actually decided in a prior suit, but also all issues which could have been raised in that action." *Brzostowski v. Laidlaw Waste Sys., Inc.*, 49 F.3d 337, 338 (7th Cir. 1995). The doctrine applies when the following three elements are established: "(1) judgment on the merits in an earlier action; (2) identity of parties or privities in the two suits; and (3) identity of the cause of action between both suits." *Id.* Based on the record,

the Court cannot find that the NLRB issued a judgment on the merits entitled to preclusive effect. Rather, the Union's unfair labor practice charge appears to have been filed in accordance with the NLRB procedures allowing

> any person to file a charge that any other person is engaging in unfair labor practices with the regional director for the region in which the unfair practice occurred. 29 C.F.R. §§ 1[0]2.9–1[0]2.10. If it appears to the regional director that formal proceedings should be instituted, he will serve a complaint in the name of the NLRB on the parties and set a hearing before an administrative law judge. 29 C.F.R. § 102.15. If the regional director declines to issue a complaint, the charging party may appeal that decision to the office of the General Counsel, who may sustain the regional director's refusal to issue a complaint or direct the regional director to take further action. 29 C.F.R. § 102.19. The General Counsel's decision not to issue a complaint is not subject to judicial review.

*Slaughter v. Fred Weber, Inc.*, 570 F. Supp. 2d 1054, 1060–61 (S.D. Ill. 2008).

The Union's charge was investigated and dismissed by an NLRB Regional Director, apparently in accordance with the above-referenced procedures. (*See* Decl. of Rory Neill, Ex. C, Dkt. No. 19-1.) However, courts have found that a decision by the NLRB not to file a complaint based on an unfair labor practice charge "is not an adjudication . . . ; indeed, it is nothing more than an exercise by the General Counsel of his prosecutorial discretion, and as such is entitled neither to be given collateral estoppel effect nor to be treated as an exercise of the [NLRB's] primary jurisdiction." *Hoskin v. Premier Sec.*, 10 C 3018, 2011 WL 2940989, at *3 (N.D. Ill. July 21, 2011) (quoting *Miller Brewing Co. v. Brewery Workers Loc. Union No. 9, AFL-CIO*, 739 F.2d 1159, 1166 (7th Cir. 1984) (superseded by statute on other grounds)). Thus, courts have found that no preclusive effect attaches to an NLRB Regional Director's decision to dismiss an unfair labor practice charge because the filing party is not given an opportunity to be heard, present evidence, or have judicial review of adverse findings. *Hoskin*, 2011 WL 2940989, at *3; *Slaughter*, 570 F. Supp. 2d at 1061. There is no evidence in the record suggesting the dismissal of the Union's charge should be treated any differently. For that reason, res judicata does not provide

a basis for the Court to vacate the January 2020 Grievance Award and Defendants' motion to vacate is also denied as to that award.

As with the September 2019 Grievance Award, it remains to be determined whether the January 2020 Grievance Award can be enforced against T.R.N. However, res judicata appears to be the only grounds advanced for vacating the January 2020 Grievance Award against Neill Cartage. That being the case, the Court sees no reason to delay enforcement of the January 2020 Grievance Award against Neill Cartage. Consequently, the Court will treat the Union's motion to enforce as one for summary judgment and grant it in part. Specifically, the Court holds that the January 2020 Grievance Award shall be enforced against Neill Cartage.

## CONCLUSION

For the foregoing reasons, the Union's motion to enforce arbitration award (Dkt. No. 25) is granted in part and denied in part. Specifically, the January 2020 Grievance Award shall be enforced against Neill Cartage. Defendants' motion to vacate and for summary judgment (Dkt. No. 26) is denied. To the extent that the Court has denied the Union and Defendants' motions due to the presence of disputed issues of fact concerning the enforceability of the Grievance Panel's awards against T.R.N., the denial shall be without prejudice to renewal. After further discovery, the Union and Defendants may bring renewed motions for summary judgment addressing that issue.

ENTERED:

Dated: September 30, 2021

_____
Andrea R. Wood
United States District Judge

15